UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF CERTAIN ADMINISTRATIVE SUBPOENAS | MBD No. 21-91444-LTS<br><br>**FILED UNDER SEAL** |

# MEMORANDUM IN SUPPORT OF APPLICATION FOR
# (1) AN *EX PARTE* ORDER PURSUANT TO SECTION 21(h)(4) OF THE SECURITIES EXCHANGE ACT OF 1934, (2) *IN CAMERA* CONSIDERATION, AND (3) ORDER TO SEAL RECORDS OF THIS PROCEEDING

The Securities and Exchange Commission ("Commission") submits this memorandum in support of (a) its application, pursuant to Section 21(h)(4) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u(h)(4), for an *ex parte* order delaying for ninety (90) days the notice otherwise required by the Right to Financial Privacy Act of 1978 (the "RFPA") when a government agency issues an administrative subpoena for the financial records of a "customer."

The Commission also requests, pursuant to Section 21(h)(5) of the Exchange Act, 15 U.S.C. § 78u(h)(5), that all proceedings concerning the RFPA application be held *in camera*, and that all records thereof remain under seal until 30 days after the conclusion of the Commission's investigation described below.

In further support of the relief requested herein, the Commission submits the Declaration of Trevor Donelan ("Donelan Dec.").

## Introduction

This application arises out of a non-public, formal investigation conducted by the Commission involving individuals who appear to have engaged—and may still be engaging in—market manipulation and insider trading in the stock of Quebec-based Loop Industries, Inc.

(NASDAQ: LOOP). According to public filings, Loop represents that it is a recycling company with technology that purifies used plastic, thus making it infinitely recyclable. Loop's common stock has been publicly traded in the United States securities markets since 2015, following a process known as reverse merger. In a reverse merger, a public company—typically with little to no operations—acquires an operating private company, which then continues its operations through the surviving post-merger public company.

As set forth further below, in the course of its investigation the Commission became aware of suspicious trading in Loop's common stock by various people. Specifically, between approximately mid-2017 and late 2018, three California residents—referred to herein as Person A (a Loop shareholder), Person B (a control person of an entity that holds Loop shares), and Person C (a Loop shareholder)—appear to have coordinated to manipulate the market for Loop stock, which appears to have enabled the group to unload Loop stock to United States-based investors at artificially high prices.[1] And, in particular, Person C—in coordination with Persons A and B—appears to have convinced an 85-year-old investor to purchase more than $5 million of Loop stock at or about the same time that the group appears to have been manipulating Loop's stock (thereby making it appear to be an attractive investment) in the public securities markets.

In addition to the foregoing, the Commission has reviewed evidence indicating that Person C shared material, nonpublic information about Loop—which Person C received from a Loop insider—to encourage investors to buy stock in exchange for a kickback.

In furtherance of the investigation, the Commission intends to serve subpoenas on at least three financial institutions—JPMorgan Chase, HSBC, and Wells Fargo—and any other bank

---

[1] The Commission has not identified the individuals' names herein or in the Donelan Dec. because of the possibility that these documents could be unsealed at a future date—notwithstanding the Commission's request—as to any customer while the investigation is ongoing. The Commission will provide the Court any additional information under seal or *in camera*, such as the customers' names, upon request.

accounts identified as the investigation continues for financial records of Persons A, B, and C. The bank records that the Commission seeks are necessary to review in order to investigate, among other things, (a) whether there are illegally obtained stock sale proceeds or other assets that can be preserved and returned to victims, (b) the full extent of the group's apparent coordinated manipulative trading and the sharing of any proceeds therefrom, (c) the full extent of any kickbacks Person C received in exchange for divulging material, nonpublic information, and (d) whether Person C shared any of those kickbacks with Person A and/or Person B (or others).

The RFPA would otherwise prohibit the financial institutions from responding to these subpoenas until the Commission certifies that the relevant customers have received written notice and an opportunity to file a motion to quash. Section 21(h) of the Exchange Act, however, provides the Commission with an exception to the RFPA's notice requirement. The Commission may submit an *ex parte* application to delay the required notice for up to ninety days if certain requirements are satisfied. Proceedings concerning such an application must be held *in camera* and the records may be kept under seal.

As set forth further below, the statutory requirements of Section 21(h) of the Exchange Act are satisfied here. Indeed, the Commission has reason to believe that notice to the customers identified below will likely, among other things, cause the transfer of assets or records outside the United States or impede the ability of the Commission to identify or trace the source or disposition of funds involved in securities transactions.

## Statutory Framework

Section 1105 of the RFPA, 12 U.S.C. § 3405, provides that a government agency may obtain an individual customer's financial records through an investigative subpoena, if the agency provides the customer with a copy of the subpoena and the customer is given fourteen days to file a motion to quash. Section 1103 of the RFPA, 12 U.S.C. § 3403, provides that a

financial institution may not produce documents in response to an agency's subpoena unless the agency certifies that it has complied with the RFPA's notice requirement.

Section 21(h)(2) of the Exchange Act, 15 U.S.C. § 78u(h)(2), provides the Commission with an exception to the RFPA's notice requirement for subpoenas issued as part of a formal investigation in accordance with Section 19(c) of the Securities Act and Section 21(b) of the Exchange Act, 15 U.S.C. § 78u(b). Section 21(h)(2) states that the Commission may obtain a customer's financial records by subpoena without prior notice upon an *ex parte* showing that certain conditions are present (described in detail below).

Section 21(h)(4)(A) of the Exchange Act, 15 U.S.C. § 78u(h)(4)(A), provides that, upon the showing required by Section 21(h)(2), "the presiding judge or magistrate shall enter an *ex parte* order granting the requested delay for a period not to exceed ninety days and an order prohibiting the financial institution involved from disclosing that records have been obtained or that a request for records has been made."

Section 21(h)(5) of the Exchange Act, 15 U.S.C. § 78u(h)(5), provides that, upon application by the Commission, all proceedings pursuant to Sections 21(h)(2) and (4) "shall be held *in camera* and the records thereof sealed until expiration of the period of delay or such other date as the presiding judge or magistrate may permit."

Congress enacted the exception to the RFPA in Section 21(h) of the Exchange Act because obtaining financial records is crucial to the Commission's enforcement mission. See H.R. Rep. No. 1321, 96th Cong., 2nd Sess. 1980, 1980 U.S.C.C.A.N. 3874, 3875-3876, 1980 WL 13008, *3 (Sept. 16, 1980). Accordingly, once the Commission makes the required showing with respect to a subpoena for financial records, "the presiding judge or magistrate must enter an ex parte order granting the request to delay notice to the customer." 1980 U.S.C.C.A.N. at 3882, 1980 WL 13008 at *9.

**The Investigation**

Loop represents through various public statements that it is a recycling company. Donelan Dec., ¶11. Loop's common stock has been traded on the Nasdaq Global stock exchange since November 2017. *Id.* Previously, from November 2015 through mid-November 2017, Loop's common stock was traded in the over-the-counter securities markets, operated by an entity called OTC Markets Group Inc. *Id.*

Between April 2017 and November 2017, trading activity derived from brokerage accounts held by, or for the benefit of, Persons A, B, or C—and other individuals and entities who appear to be associated with Persons A – C—comprised more than 33% of the total market volume of trading in Loop stock. *Id.*, ¶12. Person A was a member of Loop's board of directors during this period of time, but never disclosed the full extent of his sales of Loop stock as legally required pursuant to Section 16(a) of the Exchange Act. *Id.*, ¶¶16-17. At the time that Persons A – C and others with whom they appear to have been coordinating dominated the market for Loop stock, the company's stock price rose from around $6.00 per share to over $18.00 per share. *Id.*, ¶12. And, around this same time, Person C solicited at least one person to invest in Loop. *See id.*, ¶18.

For example, Person C appears to have contacted and successfully solicited investments totaling more than $5 million in the securities of Loop from an 85-year-old individual ("Investor A") by encouraging him to purchase stock in the public securities markets and through private purchases from Loop or from entities affiliated with Persons A – C. *Id.* Around the same time, Persons A or B sold Loop stock. *Id*.

Meanwhile, Person A—who was a member of Loop's board of directors through mid-2018—took steps to conceal his trading in Loop stock from investors and securities intermediaries. *See id.*, ¶¶14-17. Specifically, Person A appears to have arranged to trade Loop

5

securities through a front company called Ventanas Capital LLC. *Id.*, ¶16. On May 11, 2017, Person A requested power of attorney and trading authority over a brokerage account held in Ventanas Capital's name and, in doing so, falsely represented to the brokerage firm that he was not a "director, 10% shareholder or policy-making officer of a publicly held company." *Id.* In fact, at that time, Person A was a director of Loop. *Id.* Person A eventually caused Ventanas Capital to sell approximately $90,000 of Loop stock. *Id.*

## The Subpoenas

The staff intends to issue subpoenas to JPMorgan Chase, HSBC, and Wells Fargo, and any other financial institutions the staff subsequently identifies for the financial records of Person A, Person B, and Person C. A review of these individuals' bank accounts is critical to determining whether they contain fruits of illegal conduct that can be preserved for investor protection, and whether there is additional evidence of coordination and misconduct. Reviewing these individuals' bank accounts may also enable to the staff to identify other relevant accounts, and it may uncover additional examples of illegally obtained proceeds and illegal conduct.

## Argument

A delayed notification order pursuant to Section 21(h) of the Exchange is justified here.

Under Title 15, United States Code, Section 78(u)(h), "the Commission may have access to and obtain copies of, or the information contained in financial records of a customer from a financial institution without prior notice to the customer upon an *ex parte* showing to an appropriate United States district court . . . [if] . . . the Commission has reason to believe that— (A) delay in obtaining access to such financial records, or the required notice, will result in . . . (ii) destruction of or tampering with evidence; . . . or (v) impeding the ability of the Commission to identify or trace the source or disposition of funds involved in any securities transaction . . . ."

The Commission has reason to believe that notice to Persons A, B, and C would result in the destruction of evidence and would impede the Commission's ability to trace investor assets. *See* 15 U.S.C. § 78u(h)(2)(A)(ii) and (v).  The facts developed during the course of the investigation show that Persons A, B, and/or C have engaged in conduct indicating that they may try to conceal the nature of their trading in Loop stock if they become aware of a Commission subpoena.

For example, Person A appears to have tried to conceal his trading in Loop stock by operating through a limited liability company and falsely representing that he was not a director of a public company.  *See* Donelan Dec., ¶¶14-17.  Similarly, Persons A – C all appear to have benefited, at least indirectly, by encouraging others (like Investor A) to invest in Loop stock while, at or about the same time, selling or coordinating with others who were selling Loop stock.  *See, e.g., id.*, ¶¶12, 18-20.  Further, Person C appears to have divulged inside information in exchange for a kickback—information he may have received from Persons A or B.  *Id.*, ¶¶21-23.  It is logical to infer, and to be concerned, that Person C would take steps to conceal his misconduct when he has shown the willingness to intentionally flout the federal securities laws.

The foregoing examples demonstrate the surreptitious nature in which Persons A, B, and C have operated with regard to Loop securities during the period of time subject to this application.  If given notice of a subpoena, the Commission has reason to believe—and, indeed, is concerned in light of the paramount importance of identifying and preserving assets for potentially victimized investors, like Investor A—that Persons A – C may coordinate to further obfuscate the disposition of funds raised from Loop sales.

*******

For the foregoing reasons, the Commission believes that the statutory prerequisites in Section 21(h)(2) of the Exchange Act have been satisfied.  Accordingly, it is appropriate for the

Court to issue an *ex parte* order delaying for ninety days the notice otherwise required by the RFPA for the bank subpoenas referenced herein.

In addition, pursuant to Section 21(h)(5) of the Exchange Act, it is appropriate for the Court to order that all proceedings concerning the RFPA application be held *in camera*, and that, pursuant to Section 21(h)(5) of the Exchange Act and Local Rule 7.2, all records thereof remain under seal until 30 days after the conclusion of the Investigation.[2]

Respectfully submitted,

United States Securities and Exchange Commission

By:    /s/ Eric A. Forni
      Eric A. Forni (BBO# 669685)
      Alicia Reed (NY# 4913596)
      William Donahue (BBO# 631229)
      33 Arch St., 24th Floor
      Boston, MA 02110
      (617) 573-8827 (Forni)
      fornie@sec.gov

Dated: July 1, 2021

---

[2] The Commission requests that the application and papers filed in support remain under seal beyond the period of delayed notice so that the precise nature and status of the Commission's investigation as described in these papers remains covert. If the Commission were to pursue a customer's financial records through the normal course as specified in Section 1105 of the RFPA (*i.e.*, notice with the opportunity to object), the customer would be privy to a copy of the subpoena only and not the information contained in the aforementioned papers. As such, the Commission believes it is reasonable for the Court to order that the application and papers filed in support thereof remain under seal until 30 days after the conclusion of the Commission's investigation.